## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| ANDREAS VON HIRSCH, | ) | |
| | ) | |
| Plaintiff/ | ) | |
| Counter-Defendant, | ) | |
| | ) | Docket No. 2:21-cv-00107-NT |
| v. | ) | |
| | ) | |
| ANGELYN A. OLSON, | ) | |
| Defendant/ | ) | |
| Counter-Plaintiff. | ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT[*]

Before me are the motions for summary judgment of the Plaintiff/Counter-Defendant, Andreas von Hirsch (ECF No. 116), and the Defendant/Counter-Plaintiff, Angelyn Olson (ECF No. 118). For the reasons stated below, von Hirsch's motion is **GRANTED**. Olson's motion is **DENIED**.

## FACTUAL BACKGROUND[1]

---

[*] This opinion is **SEALED** until 12:00 p.m. on March 17, 2023, to give the parties an opportunity to notify the Court, by sealed filings, whether any portion needs to be redacted because of confidentiality issues.

[1] The following facts are drawn from (1) documents in the summary judgment record (ECF Nos. 1-1, 1-2, 5-1, 110–13, 121–22); (2) the parties' Joint Stipulated Facts ("**Jt. Stip.**") (ECF No. 110-1); (3) von Hirsch's consolidated statement of material facts ("**Von Hirsch's SMF**") (ECF No. 126), which is a compilation of von Hirsch's statement of material facts (ECF No. 117) and Olson's response and statement of additional material facts (ECF No. 126); (4) von Hirsch's reply to and requests to strike Olson's statement of additional facts ("**Von Hirsch's Reply to Olson's Additional Facts**") (ECF No. 128); (5) Olson's response to von Hirsch's requests to strike Olson's statement of additional facts and amended statement of additional facts (ECF No. 131); (6) Olson's statement of material facts ("**Olson's SMF**") (ECF No. 124), which is a compilation of Olson's statement of material facts (ECF No. 119) and von Hirsch's response (ECF No. 124); and (7) von Hirsch's statement of additional material facts ("**Von Hirsch's Additional Facts**") (ECF No. 124).

## I.    Von Hirsch and Olson

Andreas von Hirsch ("**von Hirsch**") is a German citizen and a retired professor of criminal legal theory. Joint Stipulation of Facts ("**Jt. Stip.**") ¶¶ 1–2 (ECF No. 110-1). In 1975, while teaching in the United States, von Hirsch purchased a shorefront home on 5.5 acres of land in Vinalhaven, Maine (the "**Property**"). Jt. Stip. ¶ 9. Von Hirsch typically uses his Vinalhaven home for about three months a year, from early July through the end of September. Jt. Stip. ¶ 12. In 2018, von Hirsch used the house from July 2 to September 21. *See* Jt. Stip. ¶ 13. In 2019, von Hirsch used the house from July 8 to October 7. *See* Jt. Stip. ¶ 14. In 2020 and 2021, von Hirsch did not go to Vinalhaven because of the coronavirus pandemic. Jt. Stip. ¶ 15.

Around the time that von Hirsch purchased the Property, von Hirsch hired Bill and Mary Olson as caretakers to assist with the Property's upkeep and maintenance. Jt. Stip. ¶ 16. Von Hirsch and Bill Olson became close friends. Jt. Stip. ¶ 16. Jack Olson, Bill and Mary's son, assisted his parents with von Hirsch's Property since 1975. Jt. Stip. ¶ 17.

Angelyn Olson ("**Olson**"), began assisting Bill and Mary after she married Jack in 1985. Jt. Stip. ¶ 21. After Mary's death on February 19, 2000, Olson became the

---

Despite the requirements of Local Rule 56(d) and my Local Rule 56(h) Pre-Filing Conference Report and Order ("**56(h) Order**"), Olson failed to file any response to the additional facts that von Hirsch submitted when he responded to Olson's supporting statement of facts. *See* D. Me. Local R. 56(d); 56(h) Order ¶ 6 (ECF No. 109). Pursuant to the Local Rules, parties must support or oppose any statements of material fact with citations to the record. D. Me. Local R. 56(f). Facts that are not opposed are deemed admitted. *Id.*; *see Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007) ("In the event that a party opposing summary judgment fails to act in accordance with the rigors that such a [local] rule imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated."); *Dixon-Tribou v. McDonough*, No. 2:20-cv-00379-NT, 2022 WL 2713518, at *1 n.2 (D. Me. Jul. 13, 2022) (same). Accordingly, von Hirsch's additional facts are all deemed admitted.

primary caretaker of the Property. Jt. Stip. ¶ 23. Between 2000 and 2006, Olson assisted von Hirsch as needed during the summer, but von Hirsch used the Vinalhaven house infrequently and Olson maintained a second job at Inland Seafood. Jt. Stip. ¶¶ 26–27.

Over the years, Olson and von Hirsch developed a "very close family-style" relationship, and the parties agree that von Hirsch "was almost like a member of the Olson household." Def.'s Opposing Statement of Material Facts and Additional Statement of Facts ("**Von Hirsch's SMF**") ¶ 34 (ECF No. 126). Until sometime in 2020, von Hirsch liked and respected Olson and considered her to be a close friend. Jt. Stip. ¶ 33. Olson believed that von Hirsch thought she was loyal to him and that he had "the highest degree of trust and confidence" in her. Von Hirsch's SMF ¶ 39.

## II.   Olson Takes on More

Bill died on July 2, 2006, and, in the years following, Olson began taking on more responsibilities for von Hirsch and his Property. Jt. Stip. ¶¶ 28–29. In 2008, Olson stopped working at Inland Seafood; in 2009, Olson worked her first full-time summer for von Hirsch as a caretaker for the Property. Jt. Stip. ¶¶ 30–31. By 2012, von Hirsch relied on Olson to manage, maintain, and care for the Property, to pay Property-related expenses, and to hire and oversee contractors performing work on the Property. Jt. Stip. ¶ 37. Von Hirsch trusted Olson and gave her unrestricted access to his Maine-based bank accounts so that she could easily pay his bills and cover expenses. Jt. Stip. ¶¶ 38–40.

In October or November of 2016 (the exact date is not specified on the document), von Hirsch executed a written Power of Attorney ("**POA**") appointing

Olson as his agent with "full power to act for and represent me in connection with" the Property. Jt. Stip. ¶ 41. The POA granted Olson authority for "signing checks" and "contracts" and gave Olson "full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done to effectuate the foregoing purpose, as fully and with the same intents and purposes as I might or could do if personally present." Jt. Stip. ¶ 41.

Beginning in 2016, Olson oversaw numerous renovation projects on the Property. For example, in 2016, Olson consulted multiple contractors and oversaw the renovation of an apartment over a barn on the Property. Jt. Stip. ¶ 43. In 2018, Olson oversaw renovations to replace a 2,500 square foot outdoor deck and attached cedar shingle skirting. Jt. Stip. ¶ 47. Olson signed at least one of the contracts with a construction company hired to perform the deck renovations. Jt. Stip. ¶¶ 47–48.

In addition to managing the Property, Olson arranged travel and transportation, shopped for food, clothing, and other necessities for von Hirsch, cooked meals, and hired staff. Jt. Stip. ¶ 51. Despite her growing responsibilities, Olson never had a written employment contract with von Hirsch. Jt. Stip. ¶ 58. Indeed, over the forty-year course of dealing with the Olson family, von Hirsch did not keep any accounts or documents related to their work or expenditures on his property. Pl.'s Opposing Statement of Material Facts and Additional Statement of Facts ("**Olson's SMF**") ¶ 41 (ECF No. 124).

## III.   Von Hirsch's Health Problems

By 2015, von Hirsh had been diagnosed with Parkinson's disease, a progressive nervous system disorder that affects movement, causing stiffness, tremors, and

difficulty with walking, balance, and coordination. Jt. Stip. ¶ 62. Von Hirsch was also diagnosed with a memory disorder and cognitive impairment, another progressive condition. Jt. Stip. ¶ 63.

During this period, von Hirsch came to rely on Olson for personal caretaking assistance. Jt. Stip. ¶ 51. Olson administered von Hirsch's medications as directed by medical professionals and scheduled and accompanied von Hirsch to medical appointments.[2] Jt. Stip. ¶ 51. In 2017, Olson began living at the Property during von Hirsch's summer stays to provide him care. Jt. Stip. ¶ 45. When von Hirsch broke his leg on July 13, 2018, Olson took him for emergency medical treatment at a medical center on Vinalhaven and then flew with him to Penobscot Bay Medical Center in Rockport, Maine. Jt. Stip. ¶ 49. Von Hirsch had limited mobility as a result of his leg injury and Olson's caretaking work increased even further as von Hirsch recovered. Jt. Stip. ¶ 50.

By June of 2018, Olson knew that von Hirsch had been diagnosed with a memory disorder and cognitive impairment, as well as with dementia. Jt. Stip. ¶¶ 64–65; Von Hirsch's SMF ¶¶ 26–27. The parties dispute the extent to which von Hirsch was affected by these conditions during the relevant time period.[3]

---

[2]     The parties stipulate that Olson has a background in nursing. Jt. Stip. ¶ 20. Olson was a licensed nurse for approximately three and a half years, and she was last licensed in January of 1990. Von Hirsch's Additional Facts ¶ 1.

[3]     Olson asserts that von Hirsch underwent a "Mental Status Test" on September 9, 2019, which "showed that von Hirsch 'fully understands [his] own finances, living arrangements, but leaves practical details in the hands of his assistants[']" and which, "'other than '[short term] memory lapses and disorientation to date, could find no evidence of cognitive function that would impair judgment or legal incompetence.'" Von Hirsch's SMF ¶¶ 158–59, 161. Von Hirsch requests to strike these statements of fact on the grounds that they are hearsay and that the underlying medical report fails

## IV.   September 18, 2018 Conversation & Testamentary Disposition

On September 18, 2018, von Hirsch had a conversation with Olson, which Olson recorded. Jt. Stip. Ex. C—9-18-18 Tr. ("**Sept. 18, 2018 Recording**") (ECF No. 110-4); Jt. Stip. ¶ 77. During this conversation, Von Hirsch and Olson discussed Olson's compensation. Von Hirsch noted that Olson was one of "the people most important in maintaining my welfare," and that, in light of the fact that he had given another employee a house, he "should make a provision in my will that you [(Olson)] get a corresponding sum." Sept. 18, 2018 Recording 2:12–2:19. Von Hirsch went on to specify that Olson would "get [the Property] when I no longer can use it." Sept. 18, 2018 Recording 10:20–10:21. Von Hirsch also stated that Olson should get money "to run [the Property]" and asked Olson how much money she thought it cost per year to cover the costs of the Property; Olson told him "it's probably 40 [to] $50,000 a year[.]" Sept. 18, 2018 Recording 18:12–18:15, 19:12. Von Hirsch explained that he could set

---

to satisfy the requirements of Federal Rule of Evidence 702. *See* Von Hirsch's Reply to Olson's Additional Facts 2–4. Olson did not respond to these requests to strike.

Still, I do not find striking warranted here. First, Rule 803 of the Federal Rules of Evidence provides a hearsay exception for "[s]tatement[s] [m]ade for [m]edical [d]iagnosis or [t]reatment," Fed. R. Evid. 803(4), and von Hirsch does not address the possibility that the document falls into that category. Moreover, although "[a] district court may exclude expert testimony [pursuant to Rule 702] when ruling on a motion for summary judgment if the testimony fails to cross the *Daubert* threshold . . . [,] the First Circuit has cautioned that the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage.' " *Murphy v. Mattis*, 2:14-cv-00400-JAW, 2017 WL 1157086, at *2 n.4 (D. Me. Mar. 27, 2017) (quoting *Cortés-Irizarry v. Corporación Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997)). "[B]ecause *Daubert* . . . requires a complex factual inquiry that is best suited to the trial setting[,] [d]istrict courts 'will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record.' " *Id.* (quoting *Cortés-Irizarry*, 111 F.3d at 188).

At this point, I simply do not have enough information to determine whether Olson's statements of fact satisfy the standards for admissibility. I do note, however, as von Hirsch points out, that Olson has quoted selectively from the Mental Status Test document, and that other portions of the report paint a far less rosy picture of von Hirsch's mental state. *See, e.g.*, Local Rule 56(h) R., at 3 (explaining that, during examination, von Hirsch "stated date was 8/18/1989") (ECF No. 122).

6

up a trust to administer the yearly $50,000 upkeep payments, and, after commenting that the lawyer setting up the trust would need to know how many years it would be in place, added that the trust would provide those payments for fifteen years. Sept. 18, 2018 Recording 41:11–41:12, 46:19–48:12.

During the conversation, Olson informed von Hirsch that she and David Perry, von Hirsch's boat captain, had both made the same salary—$60,000 per year—for the past two years. Sept. 18, 2018 Recording 15:17–15:21; Jt. Stip. ¶ 11. Von Hirsch responded, "[t]hat's crazy[,]" and "I think that's chicken shit. I think you should get a hundred and twenty . . . as salary" starting on January 1, 2019. Sept. 18, 2018 Recording 15:20, 16:10–16:19. Olson reminded von Hirsch that, "[w]hen you broke your leg, you had told me that you wanted to pay me [an] additional [$50,000 this year]" because of the extra work Olson took on. Sept. 18, 2018 Recording 16:22–17:1. "Okay. That's also done[,]" von Hirsch responded. Sept. 18, 2018 Recording 17:4. Later, von Hirsch raised that "special payment" amount to "80 [thousand dollars]," because, he told Olson, "you were extremely generous to me. I mean, . . . if you . . . had not been there [when I broke my leg], I would have just shit myself and given up the whole fucking place." Sept. 18, 2018 Recording 24:19, 25:25–26:7. During this part of the discussion, von Hirsch emphasized that Olson would also "get the house," which "is worth something." Sept. 18, 2018 Recording 18:2–18:6.

Later on, von Hirsch asked for a piece of paper and began taking notes. Sept. 18, 2018 Recording 19:18–19:23. At the top of the paper (the "**Angie's Compensation Document**"), von Hirsch wrote the date and the heading, "<u>Angie's</u>

Compensation." Def.'s Original Answer to Pl.'s Original Compl., Countercl. Against Pl., and Jury Demand ("**Olson's Countercls.**") Ex. A (ECF No. 5-1). Von Hirsch then wrote out the following items:

1) This year ([2]018):
   - Salary: 60k pa [(per annum)] (now)
   - Spec. comp. 80k
2) Subs. [(subsequent)] yrs (2019 + seq. [(et sequitur)])
   - Salary 120k (including design and implementation of changes on house + small boat)
3) Testamentary Disposition
   - Maine house
   - Upkeep: enough for 50k yearly for 15 years

Olson's Countercls. Ex. A. Von Hirsch and Olson signed their names at the bottom of the page. Olson's Countercls. Ex. A.

Von Hirsch did not keep his intentions for the Property to himself. He told, for example, his neighbors on Vinalhaven about the plan. Pl.'s Opposing Statement of Material Facts and Additional Statement of Facts ("**Von Hirsch's Additional Facts**") ¶¶ 30–31 (ECF No. 124). And, in October of 2019, von Hirsch told his estate planning lawyer, Ernst Schwartz, that he wanted to transfer title of the Property to the Olson family. Jt. Stip. ¶¶ 8, 54. On October 11, 2019, von Hirsch expressed his desire to create a life tenancy for himself and give the Olson family the Property rather than transmit the Property in a last will and testament, though a life tenancy was never actually created. Jt. Stip. ¶ 55. Instead, on December 21, 2019, and January 23, 2020, von Hirsch wrote one-page addendums to his will leaving the property to Olson. Jt. Stip. Ex. 009—Testamentary Doc. (ECF No. 113-14); Jt. Stip. Ex. 013—Testamentary Doc. (ECF No. 113-18). And, on April 29, 2020, von Hirsch signed a notarized testamentary document bequeathing the Property, as well as

€50,000 and a hippo sculpture, to Olson. Jt. Stip. ¶ 90; Jt. Stip. Ex. 015—
Testamentary Doc. 3–4, 6 (ECF No. 113-20).

Despite von Hirsch's repeated promises to leave Olson the Property, Olson and
her husband understood that von Hirsch could still change his mind about who to
leave the house to. Von Hirsch's SMF ¶¶ 45–47. And Olson states that she "never
discussed what would happen [with those promises] if I ended the job." Olson Dep.
Tr. Vol. I, at 123:17–123:18 (ECF No. 111-1).

## V.    Olson's Compensation and Spending

Between the years 2000 and 2017, Olson was paid by the hour for the work she
performed for von Hirsch. Jt. Stip. ¶ 24. In 2018, Olson was to be paid $5,000 per
month for the entire year, but, in the months of May and June of 2018, she paid
herself double. Von Hirsch's Additional Facts ¶¶ 17, 19. By the end of 2018, Olson
had paid herself $90,000. Von Hirsch's Additional Facts ¶ 20. It is not clear how much
money Olson was paid in 2019, though von Hirsch made her out a check that year for
$80,000 with a memo line reading: "Bonus 2016/2017/2018." Olson's SMF ¶ 26; Olson
Depo Ex. 039 (ECF No. 111-18).

During the relevant time period, Olson also made expenditures from von
Hirsch's accounts. In the fall of 2016, for example, Olson bought her husband, Jack,
a $53,000 tractor with von Hirsch's money. Von Hirsch's Additional Facts ¶ 26. In
July of 2017, Olson paid her son, Ladd, $17,200, though he has no information about
what, if anything, he did in exchange for that payment. Von Hirsch's Additional Facts
¶ 25. On July 7, 2019, Olson loaned Ladd over $10,000 of von Hirsch's money, but
later told him it was a gift and not to worry about paying it back. Von Hirsch's

Additional Facts ¶ 22. Between 2017 and 2019, Olson spent thousands of dollars on alcohol from a liquor store on Vinalhaven while von Hirsch was not in Maine, even though von Hirsch has been under doctor's orders not to drink alcohol since 2016. Von Hirsch's Additional Facts ¶¶ 28–29. Between 2015 and 2019, Olson used von Hirsch's money to pay for over $7,500 in products from a retailer of "personal care oils," even though von Hirsch does not use these products. Von Hirsch's Additional Facts ¶¶ 30– 31. While von Hirsch was not in Maine, Olson spent thousands of dollars of von Hirsch's money on restaurants, groceries, personal shopping, salon/spa visits, hotel stays, her personal credit card debt, and online shopping. Von Hirsch's Additional Facts ¶ 32. In 2016, Olson used von Hirsch's money to buy herself a Peloton exercise bike for $2,849.55, and then, from January of 2018 to mid-2019, Olson charged von Hirsch $41.55 per month for her Peloton subscription. Von Hirsch's Additional Facts ¶¶ 33–34.

## VI.    Trouble Brewing

In 2018, von Hirsch expressed concern about his finances to Diana Wilke, who had been hired as an academic research associate for von Hirsch at Goethe University and then began to assist von Hirsch with personal and financial matters as a fiduciary with power of attorney. Jt. Stip. ¶ 35; Von Hirsch's SMF ¶¶ 16, 49; Decl. of Diana Wilke ("**Wilke Decl.**") ¶¶ 3–4, 6 (ECF No. 110-10). Von Hirsch asked Wilke to look into his financial affairs. Von Hirsch's SMF ¶ 49; Wilke Decl. ¶ 12. In doing so, Wilke came to believe that Silvia Bracher, von Hirsch's personal assistant and

fiduciary, had been misappropriating money for her own personal benefit.[4] Von Hirsch's SMF ¶ 50; Wilke Decl. ¶ 9. On July 4, 2019, von Hirsch and Wilke called Olson to tell her about Bracher's alleged misconduct, and, that month, von Hirsch ended Bracher's authority. Von Hirsch's SMF ¶ 51; Jt. Stip. ¶ 36.

In the aftermath of these revelations, Wilke and von Hirsch sought more information about what Bracher did and how to resolve the situation. Olson Depo Ex. 005, at 000463 (ECF No. 111-5). On June 10, 2020, Wilke wrote to Olson that von Hirsch "is very concerned because of all the money that went to America. Can you provide us with documents explaining what it was spent on?" Von Hirsch's SMF ¶ 67; Olson Depo Ex. 005, at 000463. Olson responded, "I'll work on it today. Reassure him that America is all fine. It went into boat repair and house. No funds were returned to Silvia [Bracher], if that is a concern of his." Von Hirsch's SMF ¶ 68; Olson Depo Ex. 005, at 000463–64. Olson, however, never provided documentation about the spending from von Hirsch's accounts in Maine, nor did she provide an explanation about her reasons for being unresponsive to the request. Von Hirsch's SMF ¶¶ 69–70.

On July 6, 2020, von Hirsch wrote a handwritten note in German that reads in English:

> Supplement to the will

---

[4]    Olson objects to von Hirsch's statement that "Wilke discovered that Bracher . . . was disloyal and had been misappropriating von Hirsch's money for her own personal benefit" on the ground that the Wilke's declaration is "self-serving" and that Olson "has no personal knowledge." Von Hirsch's SMF ¶ 50. I take no position here as to the truth of Wilke's statement that she uncovered wrongdoing; I simply refer to the statement of fact to provide context for the events that followed.

> I, Professor Andreas Theodor Wilhelm Rudolf Freiherr von Hirsch, have made a will on April 29, 2020. I supplement this will as follows:
>
> Ms. Angelyn Olson currently residing at 50 Main St. Vindhaven [sic] ME 04863 (USA) has cared for me and my estate at 14 Kingsbury Point Rd in Vindhaven [sic] ME 04863 (USA) for many years. In light of this, I have bequeathed this property in Vindhaven [sic] in the above will.
>
> To cover my expenses incurred in the USA during my annual visits, especially for employees there, the property and my sailboat, I have regularly given funds to Mrs. Olson.
>
> During the period April 2015 to July 2019, I have transferred approximately 3.8 million Euros to Ms. Olson from my German bank account at Behlmann Bank in Munich.
>
> I wish that Ms. Olson provide a complete account of the use of these funds no later than six months after my death. Should she fail to do so, or should it turn out that Ms. Olson has used some of these funds for her own purposes, I shall cancel the bequest in favor of Ms. Angelyn Olson in full.

Jt. Stip. Ex. 017—Testamentary Doc. (ECF No. 113-22); Jt. Stip. ¶ 91.

In another handwritten note, dated August 9, 2020, von Hirsch wrote that he "revoke[d] the bequest in favor of Angelyn Olson in full." Jt. Stip. Ex. 019—Testamentary Doc. (ECF No. 113-24); Jt. Stip. ¶ 92. A little under a year later, in June and July of 2021, von Hirsch signed notarized testaments cancelling the bequests of the Property, €50,000, and the hippo sculpture to Olson. Jt. Stip. ¶¶ 94–95.

## VII.  Breaking Ties

On December 24, 2020, in a letter sent on his behalf by Wilke, Von Hirsch fired Olson and informed her that she had been replaced by another caretaker. Jt. Stip. ¶ 34. Around the same time, the locks to the Property were changed, after which point Olson could not enter to retrieve her personal property. Jt. Stip. ¶¶ 67–68. On January 25, 2021, Olson, through counsel, provided a list of personal property that

Olson requested be returned to her. Jt. Stip. ¶ 69. On March 24, 2021, Olson, through counsel, demanded the return of her property by April 2, 2021. Jt. Stip. ¶ 69. Olson did not receive her property on April 2, but, on April 5, von Hirsch's new caretaker agreed to meet with Olson and her husband to allow Olson to regain possession of her property. Jt. Stip. ¶ 70; Olson Dep. Tr. Vol II, at 318:22–318:25 (ECF No. 111-2). The new caretaker was cooperative and allowed Olson to look through the Property for anything Olson wanted to retrieve. Von Hirsch's Additional Facts ¶ 3; Olson Dep. Tr. Vol. II, at 319:1–319:5. Olson removed various personal effects at this time. Jt. Stip. ¶ 71. Whether some of Olson's personal effects remain at the Property is disputed. Jt. Stip. ¶ 71.

Olson has not received payment for any services she rendered to von Hirsch between July 2020 and December 2020. Jt. Stip. ¶ 66. Von Hirsch does not intend to give Olson the Property or money for upkeep of the Property when he dies. Olson's SMF ¶ 35.

## VIII.  The Lawsuit & Motions for Summary Judgment

In April of 2021, von Hirsch filed a lawsuit against Olson in this Court alleging breach of fiduciary duty under the Maine Uniform Power of Attorney Act (the "**MUPA**") (Count I), excessive compensation under the MUPA (Count II), breach of common law fiduciary duty to render an account (Count III), breach of duty of loyalty through expenditures to benefit Olson (Count IV), breach of duty of loyalty through excessive compensation (Count V), and conversion (Count VI). Compl. (ECF No. 1). A little over a month later, in May of 2021, Olson filed six counterclaims against von Hirsch, alleging: fraud (Counterclaim Count I), breach of contract (Counterclaim

Count II), anticipatory breach of contract (Counterclaim Count III), promissory estoppel (Counterclaim Count IV), unjust enrichment (Counterclaim Count V), and conversion (Counterclaim Count VI). Def.'s Original Answer to Pl.'s Original Compl., Countercl. Against Pl., and Jury Demand ("**Olson's Countercls.**") (ECF No. 5). As part of her counterclaims, Olson also sought exemplary damages.[5] Olson's Countercls. ¶¶ 399–411.

Now, the parties move for summary judgment on various of these claims and counterclaims.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a rational factfinder could resolve it in favor of either party. *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020). A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit." *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).

"The party moving for summary judgment bears the initial burden of showing that no" such genuine dispute exists. *Feliciano-Muñoz*, 970 F.3d at 62. Once it does so, "the burden shifts to the nonmoving party . . . to demonstrate that a trier of fact

---

[5] " '[E]xemplary damages' is a term that is synonymous with 'punitive damages . . . .' " *Denutte v. U.S. Bank, N.A.*, 2019 ME 124, ¶ 15, 213 A.3d 619. This opinion uses the terms interchangeably.

reasonably could find in his favor" with respect to each issue on which he bears the burden of proof. *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 93 (1st Cir. 2018) (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993)). Judgment should be entered "if . . . there can be but one reasonable conclusion" come trial, but "[i]f reasonable minds could differ," judgment should not be entered for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986). Therefore, "summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." *Morales-Melecio v. United States (Dep't of Health & Hum. Servs.)*, 890 F.3d 361, 368 (1st Cir. 2018) (internal quotation marks omitted).

"Cross motions for summary judgment do not change the standard." *Perea v. Ed. Cultural, Inc.*, 13 F.4th 43, 50 (1st Cir. 2021) (citation omitted). I must "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party," *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021) (citation omitted), and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed," *Alasaad v. Mayorkas*, 988 F.3d 8, 16 (1st Cir.), *cert. denied*, 141 S. Ct. 2858 (2021) (citation omitted).

## DISCUSSION

Olson moves for summary judgment on Counts II through VI of von Hirsch's Complaint, as well as on Counterclaim Counts II, III, and VI. Def./Counter-Pl.'s Mem. in Supp. of Mot. for Summ. J. ("**Olson's MSJ**") ¶¶ 2–3 (ECF No. 118). Von Hirsch moves for summary judgment on Counterclaim Counts I and III, and on Olson's request for exemplary damages. Von Hirsch's Mot. for Summ J. ("**Von Hirsch's MSJ**") 1 (ECF No. 116). Below I discuss each of these claims and counterclaims in turn.

## I.    Excessive Compensation—Maine Uniform Power of Attorney Act & Breach of Duty of Loyalty (Counts II and V)

Olson requests summary judgment on Counts II and V of von Hirsch's Complaint, which allege that Olson accepted excessive compensation in violation of the MUPA and in breach of her duty of loyalty. Olson's MSJ ¶¶ 6, 27; Compl. ¶¶ 115–18, 143–45. Section 5-912 of the MUPA states that, "[u]nless the power of attorney otherwise provides, an agent is entitled to reimbursement of expenses reasonably incurred on behalf of the principal and to compensation that is reasonable under the circumstances." 18-C M.R.S. § 5-912. The parties appear to agree that von Hirsch's POA did not specify Olson's compensation; rather, the issue is whether Olson's compensation was reasonable. *See* Olson's MSJ ¶ 8; Von Hirsch's Opp'n to Olson's Mot. for Summ. J. ("**Von Hirsch's Opp'n**") 2–5 (ECF No. 123). The MUPA[6] provides

---

[6]    In this section, I follow the lead of the parties by applying the same standard (that outlined in the MUPA) for both the MUPA and the common law claim. As Olson notes, the Restatements of Agency do not suggest a rule or standard regarding the reasonableness of an agent's compensation. *See* Def./Counter-Pl.'s Mem. in Supp. of Mot. for Summ. J. ("**Olson's MSJ**") ¶ 28 (ECF No. 118). Von Hirsch

that consideration of the "reasonableness" of an agent's compensation should take into account the following factors:

> A. The time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the service properly;
>
> B. The likelihood, if apparent to the personal representative, that the acceptance of the particular employment will preclude the person employed from other employment;
>
> C. The fee customarily charged in the locality for similar services;
>
> D. The amount involved and the results obtained;
>
> E. The time limitations imposed by the personal representative or by the circumstances; and
>
> F. The experience, reputation and ability of the person performing the services.

18-C M.R.S. § 3-721(2); *see also id.* § 5-912 ("The factors set forth in section 3-721, subsection 2 should be considered as guides in determining the reasonableness of compensation under this section.").

Here, Olson argues that she is entitled to summary judgment on the ground that "von Hirsch has not presented any evidence to support his claim" that she was excessively compensated. Olson's MSJ ¶ 6; *see also* Olson's MSJ ¶ 27. Olson also presents evidence that she says undercuts von Hirsch's allegation of excessive compensation. Olson says that she "was paid $60,000 per year in 2018" and that, in 2019, her salary was bumped up to $120,000 "as [von Hirsch's] health declined and

---

does not provide a relevant Restatement provision nor does he cite any caselaw that recognizes a common law claim for excessive compensation.

her duties increased." Olson's MSJ ¶ 9. This salary was eminently reasonable, Olson argues, because: her duties went far beyond that of a mere "caretaker"; she took on year-round duties and her employment with von Hirsch "became her full-time job"; and Wilke, von Hirsch's current agent under his power of attorney, testified that she earned far more than Olson did—"between $318,000.00 to $636,000.00 per year," and about €200,000 in 2021. Olson's MSJ ¶¶ 8–10, 12, 29, 31.

Olson's problem is that her claims are, at best, disputed, and, at worst, unsupported. For example, Olson asserts that she was paid a salary of $60,000 in 2018, but she also does not dispute that "[b]y the end of 2018, [she] had paid herself $30,000 more than her agreed salary, a total of $90,000."[7] Von Hirsch's Additional Facts ¶ 20. Moreover, while the record does support the conclusion that Olson worked full-time during the summers that von Hirsch was on Vinalhaven, and even that Olson had some year-round duties, it is disputed whether Olson's job with von Hirsch was full-time year-round or just full-time when von Hirsch was on the island. Finally, the record citations do not support Olson's contention that Wilke earns between $318,000 and $636,000 per year, and it is not clear how Olson calculated these numbers.[8]

---

[7]     Von Hirsch also gave Olson an $80,000 bonus in 2019 for the years 2016, 2017, and 2018. Olson's SMF ¶ 26.

[8]     Olson's claim regarding Wilke's compensation is even more perplexing in light of her seemingly inconsistent claim that Wilke was paid approximately €200,000 in 2021. *See* Olson's SMF ¶ 38 ("In 2021, as [ ] von Hirsch's agent under his Power of Attorney, Wilke earned €200,000.00); Olson's SMF ¶ 37 (von Hirsch pointing out in response that the record does not support assertion that Wilke earns between $318,000 and $636,000 per year); Wilke Dep. Tr. Vol. I, at 6:3–6:24, 12:3–12:12, 106:12–107:3 (ECF No. 110-20) (Wilke testifying that she charges between €150 and €300 per hour, depending on whether she's doing legal or administrative work, that she works for von Hirsch approximately 40 hours per week, and that she earned around €200,000 in 2021).

Even putting the factual impediments aside, Olson still has not shown that her compensation was reasonable as a matter of law. Viewing the facts in favor of von Hirsch, as the non-moving party, a reasonable juror could find that Olson's duties (even if she was more than a mere summer caretaker) did not warrant the compensation she earned, particularly in light of the factors provided by the statute, such as the fee customarily charged in the locality for similar services. *See* Von Hirsch's SMF ¶ 102 (stating that, in work that she had done for other clients on Vinalhaven, Olson charged $3,000 per year for caretaking plus $35 per hour for cleaning). And, while Olson calls attention to Wilke's compensation to show that Olson's compensation was comparatively reasonable, a juror could conclude that Wilke's higher compensation was reasonable based on the hours Wilke worked, the services she provided, and/or her background and training. *See* Jt. Stip. ¶ 35 (stating that Wilke is a lawyer). A reasonable juror could even conclude that *neither* Olson's nor Wilke's compensation was reasonable. Given these possibilities, Olson is not entitled to summary judgment on Counts II or V of von Hirsch's Complaint.

## II.   Breach of Common Law Fiduciary Duty to Render an Account (Count III)

Count III of von Hirsch's Complaint alleges that Olson breached her duties to von Hirsch by failing to render an account of how Olson spent von Hirsch's money and by refusing to turn over records showing how she spent that money. Compl. ¶¶ 126–27. Section 382 of the Second Restatement of Agency states that, "[u]nless otherwise agreed, an agent is subject to a duty to keep, and render to h[er] principal, an account of money or other things which [s]he has received or paid out on behalf of

the principal." Restatement (Second) of Agency § 382 (Am. L. Inst. 1958). Similarly, Section 8.12 of the Third Restatement of Agency states that, "[a]n agent has a duty, subject to any agreement with the principal . . . to keep and render accounts to the principal of money or other property received or paid out on the principal's account." Restatement (Third) of Agency § 8.12 (Am. L. Inst. 2006). "An agent satisfies this duty by acting in accord with any agreement with the principal and, otherwise, by acting reasonably in light of custom and practice in the agent's industry and the nature of the agent's engagement." *Id.* § 8.12 cmt. d; *see also* Restatement (Second) of Agency § 382 cmt. a ("[An agent's] duty in these respects is satisfied if [s]he acts reasonably in view of the business customs of the community and the nature of h[er] employment.").

Olson asserts that she is entitled to summary judgment on this claim because, as is permitted under these agency principles, von Hirsch and Olson agreed to a modification of Olson's duty to render an account, and/or because Olson acted reasonably in view of von Hirsch's custom not to require Olson and his other employees to keep written records. Olson's MSJ ¶¶ 17–19. To support the first argument, that she acted according to an agreement with von Hirsch, Olson asserts that "von Hirsch expressly instructed Angie not to keep accounts." Olson's MSJ ¶ 17. Olson does not provide a citation for this claim, and I am not able to discern anything in the record that would support it. As such, Olson's argument for summary judgment fails on this basis.

Olson's second argument for summary judgment—that she acted reasonably in light of the parties' custom—is also unconvincing. Olson asserts that over her course of dealing with von Hirsch, von Hirsch never did business in writing with Olson or the Olson family. Olson's MSJ ¶ 17; *see also* Olson's SMF ¶¶ 41, 43. She also claims that von Hirsch had a similar arrangement with his other employees. Olson's MSJ ¶ 18. Even so, there are other facts that undermine Olson's claim that she acted reasonably in not providing records. For example, when Wilke wrote to Olson requesting documentation for Olson's spending, Olson responded "I'll work on it today"—a response that could be interpreted by a reasonable juror as a sign that Olson *did* believe that she was supposed to be keeping records. Von Hirsch's SMF ¶ 68. More concerningly, in the face of a direct request for an accounting of her spending, Olson never turned over any information—an act that a reasonable juror could perceive as *unreasonable*, even if, in the past, Olson had not been required to report on her spending. Von Hirsch's SMF ¶¶ 69–70.

Because a reasonable juror could find in favor of von Hirsch, Olson's motion for summary judgment on Count II of von Hirsch's Complaint is denied.

## III.   Breach of Duty of Loyalty—Expenditures to Benefit Olson (Count IV)

Count IV alleges that Olson breached her duty of loyalty to von Hirsch by withdrawing "money from von Hirsch's account to pay for large quantities of goods and services that benefitted her and that von Hirsch did not need or want," and by making "a loan of more than $10,000 to her son using von Hirsch's money." Compl. ¶¶ 137–38. The Second Restatement of Agency provides that, "[u]nless otherwise agreed, an agent is subject to a duty to h[er] principal to act solely for the benefit of

the principal in all matters connected with h[er] agency." Restatement (Second) of Agency § 387. The Third Restatement adds that "[a]n agent has a duty . . . not to use property of the principal for the agent's own purposes or those of a third party," except where the agent has the principal's consent to do so. Restatement (Third) of Agency § 8.05 & cmt. b. A principal's consent renders permissible a breach of this duty, provided that:

> (a) in obtaining the principal's consent, the agent
>
>> (i)    acts in good faith,
>>
>> (ii)   discloses all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and
>>
>> (iii)  otherwise deals fairly with the principal; and
>
> (b) the principal's consent concerns either a specific act or transaction, or acts or transactions of a specified type that could reasonably be expected to occur in the ordinary course of the agency relationship.

*Id.* § 8.06.

Olson's POA gave her " 'full power to act for and represent [von Hirsch] in connection with' the Property." Jt. Stip. ¶ 41. It is clear that some of the expenditures Olson made, the loan to her son for example, were not "in connection with" the property and thus exceeded the scope of her POA. Olson argues, however, that she still is entitled to summary judgment on this claim because von Hirsch consented to those expenditures. Olson's MSJ ¶ 22. As support, Olson cites to her deposition where she says that she "testified that she and [ ] von Hirsch would periodically review his bills and discuss any purchases that were made for her personal benefit." Olson's MSJ

22

¶ 22. The cited portion of the deposition transcript, however, only shows that Olson testified that she and von Hirsch *sometimes* discussed Amazon purchases and personal credit card bills she paid for with von Hirsch's money. *See* Olson Dep. Tr. Vol. I, at 113:3–114:21. This may suggest that von Hirsch consented to *some* of Olson's spending for her own benefit, but it does not establish Olson's contention that von Hirsch consented to *all* of Olson's spending, and it specifically does not support the claim that von Hirsch consented to the loan to her son.

Moreover, other facts controvert Olson's contention that von Hirsch authorized her to use his money for her own personal benefit. For example, in July of 2020, von Hirsch wrote that if Olson had used his money for her own personal purposes, he would cancel the bequest he had made for her in his will. Jt. Stip. ¶ 91. In the light most favorable to the nonmoving party, a reasonable juror could see that note as evidence that von Hirsch did *not* consent to Olson's use of his money for her personal benefit. Furthermore, when it came to Olson's spending of his money, Olson has testified that von Hirsch only wanted to know the "big picture" and "not how the sausage is made." Von Hirsch's Additional Facts ¶ 9. This could suggest that von Hirsch did not know the details of Olson's spending, and thus that he could not have consented to it. Finally, von Hirsch raises the possibility that his cognitive impairments made it such that he could not give consent and/or that any consent he did give was the product of undue influence. Von Hirsch's Opp'n 11–12.

In sum, the record here is open-ended enough to allow a reasonable factfinder to resolve this claim in favor of von Hirsch. Accordingly, Olson's motion for summary judgment as to Count IV of von Hirsch's Complaint is denied.

## IV.    Conversion (Count VI)

Count VI of von Hirsch's Complaint alleges that Olson converted von Hirsch's money, "records[,] and documentation showing her expenditures for her own benefit." Compl. ¶¶ 148–49. "The gist of conversion is the invasion of a party's possession or right to possession at the time of the alleged conversion." *Withers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 798 (quoting *Gen. Motors Acceptance Corp. v. Anacone*, 160 Me. 52, 82, 197 A.2d 506, 524 (1964)). To make out a prima facie case of conversion under Maine law, a plaintiff must show: (1) a property interest in the property that was converted; (2) that he had a right to possession of the property at the time of the conversion; and (3) "that the party with the right to possession made a demand for its return that was denied by the holder." *Id.*

Here, Olson argues that she is entitled to summary judgment because "von Hirsch was fully aware of and consented to [Olson]'s use of his funds for her benefit." Olson's MSJ ¶ 36. As detailed in the previous section, however, the issue of whether von Hirsch consented to some or all of Olson's use of his funds is disputed. As such, summary judgment is not appropriate on Count V of von Hirsch's Complaint.

## V.    Fraud (Counterclaim Count I)

Count I of Olson's Counterclaims alleges that von Hirsch made various fraudulent misrepresentations to Olson in the Angie's Compensation Document. Olson's Countercls. ¶¶ 293–96. Under Maine law,

> [t]he essential elements of fraud, or fraudulent misrepresentation, are
> "(1) that [one party] made a false representation; (2) of a material fact;
> (3) with knowledge of its falsity or in reckless disregard of whether it is
> true or false; (4) for the purpose of inducing [another party] to act in
> reliance upon it; and (5) [the other party] justifiably relied upon the
> representation as true and acted upon it to [its] damage."

*Flaherty v. Muther*, 2011 ME 32, ¶ 45, 17 A.3d 640 (quoting *Me. Eye Care Assocs. P.A.*

*v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707).

Von Hirsch asserts that he is entitled to summary judgment on this counterclaim because there is no evidence of any fraudulent intent and ample evidence that von Hirsch in fact did intend to follow through on the promises contained in the Angie's Compensation Document. Von Hirsch's MSJ 4–5. I agree. As von Hirsch notes, the record is replete with evidence that von Hirsch had every intention of fulfilling his promises to Olson. For example, in the years immediately after executing the Angie's Compensation Document, von Hirsch pursued various legal avenues to enshrine his bequest to Olson in a more formal document—including by making addendums to his will and signing a notarized testamentary document. Jt. Stip. ¶¶ 54–55, 87–89, 90. Even von Hirsch's neighbors knew that von Hirsch intended to give Olson the Property after his death. Olson's SMF ¶¶ 30–31. Further, as the parties stipulate, the Angie's Compensation Document was executed during a period in which "von Hirsch liked and respected Olson and considered her to be a close friend." Jt. Stip. ¶ 33. Finally, there is no suggestion that von Hirsch would have needed to fraudulently induce Olson into staying in his employ as there is no evidence that Olson had threatened to quit or thought about doing so and Olson herself thought that her compensation was "extremely generous." Von Hirsch's SMF ¶ 98.

Olson responds that there is "direct evidence" that von Hirsch acted with fraudulent intent, pointing to von Hirsch's deposition in which he stated that: "it was never my intention to give [Olson] the house in Vinalhaven." Def.'s Mem. in Resp. to Pl.'s Mot. for Summ. J. 3 (ECF No. 125) (quoting von Hirsch Dep. Tr. 8:10–8:11 (ECF No. 112-4)). Ordinarily, this statement would be enough to defeat summary judgment, but here I am not convinced. The statement Olson relies on was itself made in the context of several untruthful or inaccurate statements. The exchange reads as follows:

> Q. Sir, did you give Angie -- Angie Olson -- did you promise to give Angie Olson the house on Vinalhaven?
>
> A. No, I did not.
>
> Q. Did you ever tell anyone that you were going to give Angie Olson the house on Vinalhaven, sir?
>
> A. No, because that -- it was never my intention to give her the house in Vinalhaven.
>
> Q. Okay. And did you offer to ever give Angie Olson any money in your will?
>
> A. My present will does not include any such definition.
>
> Q. Okay. Did you ever intend to give Angie Olson any money in your will?
>
> A. I cannot exactly recall, but my impression is no.

Von Hirsch Dep. Tr. 8:5–8:17. Olson herself would presumably argue that the first statement is false, because she seeks to enforce this promise. As for the other statements, the record shows that von Hirsch told several people about his plans to give Olson the Property and that he actually did execute a notarized testamentary

document bequeathing the Property and money to Olson. Given this evidence, it is hard to give much, if any, weight to these statements made by von Hirsch in April of 2022, by which time he had been suffering from dementia for at least four years.

"Although it is unusual to grant summary judgment on scienter, summary judgment on this issue . . . 'may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.' " *Miss. Pub. Emps. Ret. Sys. v. Bos. Sci. Corp.*, 649 F.3d 5, 20 n.14 (1st Cir. 2011) (quoting *SEC v. Ficken*, 546 F.3d 45, 52 (1st Cir. 2008)). Such is the case here. Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Papkee v. MECAP, LLC*, No. 2:20-cv-00006-NT, 2022 WL 504111, at *3 n. 8 (D. Me. Feb. 18, 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). On the record before me, no reasonable juror could believe that, at the time he executed the Angie's Compensation Document, von Hirsch did not intend to leave Olson the Property and that he acted with fraudulent intent. I thus decline to adopt Olson's version of events here. Von Hirsch's motion for summary judgment on Counterclaim Count I is granted.

## VI.    Breach of Contract (Counterclaim Count II)

In Counterclaim Count II, Olson asserts a breach of contract claim against von Hirsch. Olson's Countercls. ¶¶ 307–14. Specifically, Olson asserts that the Angie's Compensation Document was an enforceable agreement that von Hirsch breached by firing her "unilaterally and without cause" and by failing to pay her for services

rendered between July 2020 and December 2020.[9] Olson's Countercls. ¶¶ 307, 312–14. Now, Olson argues that she is entitled to summary judgment on this claim. I am not persuaded.

First, Olson's claim that von Hirsch breached the agreement by firing her is a non-starter. As the parties stipulate, Olson was an at-will employee—she "understood that she could quit at any time, and, likewise, that von Hirsch could fire her at any time." Jt. Stip. ¶ 58. Olson's understanding as to her employment status is in keeping with the presumption under Maine law that "an employment contract of indefinite duration may be terminated at will by either party." *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 155 (Me. 1991). And, although there is an exception to this general rule where the contract "expressly restrict[s] the employer's common law right to discharge the employee at will," *id.*, Olson points to nothing in the Angie's Compensation Document or elsewhere in the record that could be interpreted as such an express restriction.

As for Olson's second allegation—that von Hirsch breached the Angie's Compensation Document by failing to pay her for services rendered between July of 2020 and December of 2020—there are still numerous unanswered questions that preclude summary judgment. For example, though the parties stipulate that "Olson has not received payment for any services she may have rendered to von Hirsch between July 2020 and December 2020," Jt. Stip. ¶ 66, it is not clear based on the

---

[9]     In her motion, Olson makes arguments related to von Hirsch's decision not to leave her the Property or the accompanying upkeep payments. Olson's MSJ ¶¶ 41–43. I address these issues below in discussing Olson's anticipatory breach of contract claim.

record what, if any, services Olson actually provided during that time period. As von Hirsch notes, he did not travel to Vinalhaven at all during 2020 as a result of the Covid-19 pandemic, raising the prospect that Olson was not compensated for those months because she did not perform any work during that time. *See* Von Hirsch's Opp'n 13; Jt. Stip. ¶ 15. In addition, von Hirsch raises the possibility that it was Olson, not von Hirsch, who first materially breached any employment agreement. *See* Von Hirsch's Opp'n 14. If Olson did materially breach the agreement by, for example, converting von Hirsch's money to her own use or failing to turn over information as to her spending of von Hirsch's money, then it is possible that von Hirsch's obligations under the agreement would have been discharged. *See H&B Realty, LLC v. JJ Cars, LLC*, 2021 ME 14, ¶ 16, 246 A.3d 1176 ("A material breach of contract is a nonperformance of a contractual obligation that excuses the injured party from further performance and justifies the injured party in regarding the whole transaction as at an end.").

Given the many remaining uncertainties, Olson is not entitled to summary judgment as to Counterclaim Count II.

## VII.  Anticipatory Breach of Contract (Counterclaim Count III)

Olson and von Hirsch both move for summary judgment on Olson's Counterclaim Count III, which asserts a claim of anticipatory breach of contract against von Hirsch. Olson's Countercls. ¶¶ 316–28. This counterclaim is premised on Olson's allegation that the Angie's Compensation Document contained an agreement that von Hirsch would leave Olson the Property and $50,000 per year for fifteen years

29

for upkeep, and that, through his actions, von Hirsch has evidenced his intention not to perform his part of that agreement. Olson's Countercls. ¶¶ 325–27.

An anticipatory breach, or anticipatory repudiation, of a contract is "a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Wholesale Sand & Gravel, Inc. v. Decker*, 630 A.2d 710, 711 (Me. 1993) (quoting 4 Arthur L. Corbin, Corbin on Contracts § 973 (1951)). In this case, the issue is not whether von Hirsch intends to follow through on the testamentary disposition—it is undisputed that "von Hirsch does not intend to make the future gifts to which [Olson] claims to be entitled." Von Hirsch's Opp'n 15. Rather, the issue is whether the portion of the Angie's Compensation Agreement containing the bequest of the Property and money for upkeep is an enforceable contract capable of being breached at all.

Under Maine law, an enforceable contract consists of "(1) a meeting of the minds; (2) consideration; and (3) mutuality of obligations." *Bradley v. Kryvicky*, 574 F. Supp. 2d 210, 222 (D. Me. 2008) (citing *Dom J. Moreau & Son, Inc. v. Fed. Pac. Elec. Co.*, 378 A.2d 151, 153 (Me. 1977)). "The establishment of a contract requires that the parties mutually assent 'to be bound by all its material terms; the assent must be manifested in the contract, either expressly or impliedly; and the contract must be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties.' " *Forrest Assocs. v. Passamaquoddy*

*Tribe*, 2000 ME 195, ¶ 9, 760 A.2d 1041 (quoting *VanVoorhees v. Dodge*, 679 A.2d 1077, 1080 (Me. 1996)).

Olson contends that the testamentary disposition provision of the Angie's Compensation Document constitutes an enforceable contract because there was a meeting of the minds, as evidenced by the Document itself and the signatures affixed to it, and because von Hirsch's promise was made "in consideration with [Olson's] many years of work for [von Hirsch] in the past and in the future." Olson's MSJ ¶ 48. By contrast, von Hirsch argues that he is entitled to summary judgment because the purported contract is unsupported by consideration, the purported contract is missing key terms, and the parties' conduct after the Angie's Compensation Document was created is not consistent with it being an enforceable agreement. Von Hirsch's MSJ 12–19.

I begin with the question of consideration. There is a genuine dispute as to whether von Hirsch's promise was made in consideration of Olson's "many years of work for [von Hirsch] in the past and in the future." Olson's MSJ ¶ 48. The testamentary disposition provision does appear under the heading, "Angie's Compensation," which could indicate that the disposition was made in exchange for Olson's continued services. Other facts, however, suggest that the disposition was "nothing more than a naked promise" by von Hirsch.[10] *Estes v. Smith*, 521 A.2d 682,

---

[10]     Olson admits that she did not ask von Hirsch to give her the property—either in exchange for services or for any other reason. Von Hirsch's SMF ¶ 104. And Olson herself believed that von Hirsch wanted to give her the property in recognition of the "loyalty of the Olson family," because the Olson family "recognized the value of the place," and/or out of concern that von Hirsch's son "find his own place in the world"—not necessarily in exchange for services. Olson Dep. Tr. Vol. II, at 202:6–202:15 (ECF No. 111-2); *see also* Von Hirsch's SMF ¶ 106.

685 (Me. 1985). On the whole, there is a lack of clarity on the issue of consideration, which precludes summary judgment for Olson and precludes summary judgment for von Hirsch on that basis.[11]

Other aspects of the record, however, do support von Hirsch's bid for summary judgment on this counterclaim. Even viewing the facts in the light most favorable to Olson, no reasonable juror could find that there was a meeting of the minds as to all the essential terms of the agreement. "For a contract to be enforceable, the parties thereto must have a distinct and common intention which is communicated by each party to the other." *Searles v. Trs. of St. Joseph's Coll.*, 1997 ME 128, ¶ 13, 695 A.2d 1206 (internal quotation marks omitted). And although it is true that "lack of a key term is not necessarily fatal to the enforcement of a contract," *Pellitier v. Pellitier*, 2012 ME 15, ¶ 15, 36 A.2d 903, it is also true that "[a] court cannot enforce a contract unless it can determine what it is." *Ault v. Pakulski*, 520 A.2d 703, 704 (Me. 1987) (quoting 1 Arthur L. Corbin, Corbin on Contracts § 95, at 394 (1963)). The record before me does not provide the information necessary to enforce this contract.

First, the Angie's Compensation Document omits several essential terms as to the testamentary disposition. As von Hirsch points out, even if the parties intended to make the testamentary disposition in exchange for Olson's past and continued

---

[11]     Where the parties are both seeking summary judgment on this claim, it bears noting what each side would have to do to prevail. For her part, to win summary judgment on her counterclaim, Olson must show that, even when viewing the evidence in the light most favorable to von Hirsch, there is undisputed evidence on each of the elements of the claim sufficient for me to find as a matter of law that von Hirsch committed an anticipatory breach of contract. For his part, to win summary judgment, von Hirsch need only show, when viewing the evidence in the light most favorable to Olson, that she cannot establish one of the essential elements of her claim.

services, the document is silent as to the duration, nature, and scope of those services. *See* Von Hirsch's MSJ 13–14. As a result, the testamentary disposition provision raises more questions than answers. It, for example, says nothing about revocability of the testamentary disposition. It does not contemplate how much longer into the future Olson was required to work before she was entitled to the disposition. There is no provision dealing with what would happen if Olson was fired or if she decided to quit. The absence of these details makes it impossible to "determine [the document's] exact meaning [or] fix exactly the legal liabilities of the parties." *Forrest Assocs.*, 2000 ME 195, ¶ 9, 760 A.2d 1041 (quoting *VanVoorhees*, 679 A.2d at 1080).

Moreover, evidence outside the four corners of the agreement does not fill in the gaps or establish that there was any meeting of the minds as to the missing terms. This is the rare case where we actually have a recording of the conversation that gave rise to the disputed document, but even the recording does not shed light on the missing terms. Similarly, Von Hirsch, made two addendums to his will and a notarized testamentary document, each purporting to bequeath Olson the Property, but none of these documents provide pertinent information.

The evidence in the record supports the conclusion that even Olson did not view the testamentary disposition as irrevocable. It is undisputed that Olson and her husband understood that von Hirsch could always change his mind about who would inherit the Property. Von Hirsch's SMF ¶¶ 45–47. And Olson herself admitted that she could be fired at any time and that she and von Hirsch "never discussed what

would happen [with those promises] if I ended the job." Olson Dep. Tr. Vol I, at 123:17–123:18.

In sum, even viewing the record in Olson's favor, von Hirsch has established that no reasonable juror could conclude that there was a meeting of the minds on all the terms necessary to render this contract enforceable as an irrevocable testamentary disposition. As such, von Hirsch's motion for summary judgment on Counterclaim Count III is granted.

## VIII.   Conversion (Counterclaim Count VI)

In Counterclaim Count VI, Olson claims that von Hirsch has refused to turn over certain items of Olson's that are being stored at the Property. Olson's Countercls. ¶¶ 394–97. Olson asserts that she is entitled to summary judgment on this counterclaim, arguing that "there is no genuine issue of material fact on each element of conversion." Olson's MSJ ¶ 56. That is not true. Indeed, the parties stipulate that "[w]hether some of [Olson's] personal effects remain at the Property is disputed." Jt. Stip. ¶ 71. Olson is therefore not entitled to summary judgment on this counterclaim.

## IX.   Olson's Request for Exemplary Damages

Von Hirsch asks for summary judgment on Olson's request for punitive damages. Von Hirsch's MSJ 19; Olson's Countercls. ¶¶ 400–11. Under Maine law, punitive damages are only available where there is underlying tortious conduct. *See Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 155 (Me. 1979); *see also Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 776 (Me. 1989) ("No matter how egregious the breach, punitive damages are unavailable under Maine law for breach of contract."); *Wuestenberg v. Rancourt*, 2020 ME 25, ¶ 19 n.3, 226 A.3d 227 (holding that punitive

damages claim failed "because there was no underlying tort"). In this case, Olson's request for punitive damages is based on her allegation of fraud, *see* Olson's Countercls. ¶¶ 400–11, which is a claim that I have already determined should be dismissed. Thus, I agree with von Hirsch that punitive damages are not appropriate here and grant his motion for summary judgment on this request.

## CONCLUSION

For the reasons stated above, von Hirsch's motion for summary judgment (ECF No. 116) is **GRANTED** as to Counterclaim Counts I and III and as to Olson's request for exemplary damages. Olson's motion for summary judgment (ECF No. 118) is **DENIED** as to all claims and counterclaims.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 3rd day of March, 2023.